You may be seated. Mr. McDonnell. If it pleases the court, David McDonnell on behalf of the plaintiff and the appellate. I'd like to begin with a discussion of causation because the court's rulings on causation seem to be fundamental to so many other rulings that the court arrived at. Here, the question of causation, of course, is necessary for medical malpractice, is necessary to everything else. The evidence on causation in this case is addressed by the parties. Mr. Gunter has presented evidence that through his expert witnesses that he did not receive the doses of Coumadin that he was required to have in order to maintain adequate anticoagulation during his stay in the Stokes County Jail and in the Davie County Jail. Dr. Yoder. Just so that I understand the context of the argument in light of where we are. Do you agree that you lose causation if we were to affirm the exclusion of your doctors, Yoder, and labor? It's fundamental to the case. I just want to make sure that you're not making an argument separate from that. You're saying, assuming we agree with you on the expert exclusion issue, here's how you establish causation. I don't see how we go forward without causation. Totally fine. Just want to understand where we were in the concept. I understand, Your Honor. The trial court required the plaintiff to establish that he was properly anticoagulated at the time that he was arrested on a bench warrant. Under these circumstances, he had taken Coumadin for 20 years because of his mechanical heart valve. He had done so without incident for all of those 20 plus years. This was a matter of habit. The habit was testified to by him. The habit was testified to by his treating physician, Dr. Yoder. It was testified to by his daughter and his brother and his family members. They all said that he was always compliant with taking his medication and there had never been any untoward consequences as a result of this. Dr. Yoder said that the relevant time period here is the month of November. Beginning 1st of November through the end of November when he was put in the hospital with strokes from blood clots. The only contrary evidence about this is Dr. Cease's expert opinion who says that she based her opinion that he was not adequately anticoagulated on her understanding of the pharmacy records. The pharmacy records that she says indicate that he did not have access to medication for weeks before he was picked up. Well, that is simply untrue. The pharmacy records show that even though his prescription ran out, he still went to the same pharmacy and still received enough medication so that he was always able to maintain his anticoagulation. Now, he did not get the... You said it's not true. But here, you don't have to prove it's not true. You only need to explain to us why there's like a reasoned debate about that question. That a fact finder could find that it's not true. I certainly think that there is at least a genuine question of material fact as to whether he was adequately anticoagulated. You think there's enough evidence that a jury could conclude that? I certainly do. I think that habit evidence is certainly admissible. And the fact of the pharmacy records were admitted by the court and they show that with very few exceptions and only small exceptions, and all of these exceptions occurred before November, that he was taking his medication every day and that he did have an adequate supply of Coumadin throughout this process to satisfy what the expert witnesses have said is his necessary regimen. Now, it's true that he was unable to afford to continue to see Dr. Goder and that that's probably not best practices. But medical care is not available to everybody in this country. And a person in financial distress who's behind on his child support has to make choices. And he continued to take his medication and he still had it. The INR, according to Dr. Labor and according to Dr. Goder, is not necessary. Not necessary because Dr. Goder was familiar with his habits and she knew that he was going to be compliant with the medication. Yes, it's a good idea to get the test, but he couldn't afford the test. Now, it's important that when Dr. Maldonado got the case, he did not order an INR immediately to do his prescription. He waited for several days after the case came to him before he even ordered an INR. And when he finally did, then it was apparent that he was essentially uncoagulated at all. So this was a serious breach. He then adjusted his prescription and didn't give him a seven and a half dose until several days after he got the INR results. But so even Dr. Maldonado did not seem to think that it was necessary for prescriptions to have the INR done. So it perplexes me how the court came to the conclusion that we did not establish to the court's satisfaction that the injuries were caused by the lack of medication while he was in custody. What about after he's released on the 21st? That's another issue. And after he was released, well, in North Carolina, the Department of Public Safety operating the prisons for convicted prisoners requires that when a prisoner is released, they require the medical personnel to provide a discharge summary as well as a supply of medication when a person is discharged. Now, our contention is that the 15th Amendment requires that confinees like David Gunner who have not been convicted of a crime are entitled to the same protections that convicted prisoners are. So when he was released on the day before Thanksgiving... Can I ask you about that? The parties have all argued that the pretrial detainee here was subject to the Eighth Amendment standard. Since the district court decided its case, the Fourth Circuit, in an opinion by my colleague, made clear that Kingsley actually applies to those instances, which changes it from an objective to a subjective standard. On the 1983 suit, isn't that sufficient to just say it's got to go back because the district court relied on the subjective piece of this? We certainly think so, Your Honor. It was not briefed because that opinion did not come out before our briefing was complete. The short case, is that correct? Correct. And that's your view of what we ought to do, is it ought to go back for the district court to consider at summary judgment or trial the objective inquiry. It's not, particularly given that it hadn't been briefed, it's not for us to try to do that here. That's correct. And I particularly think that Nurse Jackson's conduct needs to be examined in light of the evidence that surfaced really days before the summary judgment motion was filed. Which was that she, in fact, had information from the clinic that Mr. Gunter had identified to her that the proper dosage was seven milligrams or seven and a half, whatever it was that that fact said. They didn't give us that fact. We discovered that after the close of discovery when we were trying to get a look at the original documents because we couldn't read them. And then that document was in there. And it certainly raises an awful lot of credibility questions about what Nurse Jackson did. In terms of saying that she couldn't confirm the right amount of the dosage and that she couldn't rely on, that she couldn't, that Maplewood did not give her information. Now the trial judge looked at the records from Maplewood and determined that Maplewood physicians did not issue the prescription. And therefore he didn't consider that the Maplewood clinic who had been seeing him said that he did have this prescription and it was seven and a half milligrams or whatever it was that they said. Now she just ignored that. That was information that she had available and she did not provide that information to the prescribing doctor, Dr. Maldonado. And for this reason we think that he was underdosed for the time that he did receive medication. But there were also times that he received no medication. The first two days and all of the days between his transfer from Davie to Stokes, he did not get any medication. Because they again did not provide a discharge summary and did not provide him with the supply of medication. And so in terms of the burden of proof which the court has mentioned in the calendar notice, the trial court clearly placed the burden of proof on us to be able to establish that he was properly anticoagulated the moment that he arrived at Davie Prison. And now I think that the case law does not require us to exclude all potential alternative theories. And that case I think is Rohrbach. And here what the defendants have done is they have proposed an alternative causation. And the alternative causation was that he was not adequately anticoagulated when he arrived. Now the only evidence that they have of this is Dr. Cease's opinion which is based upon a misreading of the pharmacy records. So it perplexes me how the court could conclude that on the state of this record, we have failed to carry our burden of proof. And the court clearly placed that burden of proof on the plaintiff whereas I don't think we do. Now it would be impractical for us to exclude all potential alternatives. This is an affirmative defense that there was some alternative cause for his injuries. And we didn't assert that, they did. And we rebutted that and we believe that we rebutted it completely. The other issue that is on the calendar is the non-delegable duty. And I would like to address that if I might as well. And that is the North Carolina Supreme Court in Medley has established that it is the state, anytime the state takes someone into custody that they have a non-delegable duty to provide the medical care for inmates, whatever is necessary for their health. And here the state assigned that responsibility first to the counties and the sheriffs who operate the jails. Then the counties and the sheriffs have hired Southern Health Partners, a for-profit medical care provider to provide that medical service. Fine, but the trial court found that that contract insulates the county and the sheriffs. And that's a delegation and that's contrary to North Carolina's determination that it's a non-delegable duty. Further, Southern Health Partners delegated its duty that it undertook by contract to its nurses, employees, and to its independent contractors. So here this non-delegable duty was delegated at least two and maybe three times. And I think that the trial court erred in that respect and that those obligations are non-delegable and may not be delegated this way. And the court found that that was the reason to let the counties and the sheriffs and Southern Health Partners out of the case. I think the court probably doesn't reach that issue without addressing the causation question, but there's clearly a genuine question of material fact about causation. And we of course contend that the trial court improperly excluded our expert opinions for the reasons that we've given in the brief. May I reserve my balance of my time? It's all reserved. Thank you very much. Thank you. Mr. Long? May it please the court. I'm Jimmy Long. I'm here representing the medical defendants at the Davian-Stokes County Jails, which is Southern Health Partners, the two nurses Hunt and Jackson, P.A. Maldonado and Dr. Junkins. The first point I want to make for the court that's very important is in their briefing, the plaintiffs have abandoned all of their claims against all parties on the medical side except for Jackson and Maldonado. There was nothing in the argument in regards to the court's determinations about Nurse Hunt, who was the nurse at Stokes, which is the second jail that he went to. They've also abandoned all of the other causes of action, including 1983. So there's been no discussion in the brief about the 1983 claims against the medical defendants. So I do agree approximate cause is the important issue for the court to consider, because if the approximate cause fails, then the case should be affirmed. And I would point out that Judge Osteen spent a lot of time on this issue. The order in this case is 95 pages long, and he gave us a two and a half hour argument on just the issue of approximate cause, and it was clear he had read all of the depositions. Counsel's description of the dispute here as being like a competition between the experts is not accurate. What Judge Osteen said, which is entirely consistent with the approximate law in the Fourth Circuit in the federal cases, is that the opinion of the experts must be based on admissible evidence. It can't just be them saying the magic words and basically getting over that hurdle. You have to show some sort of admissible evidence. And when you look at the facts that were set out in this case, Mr. Gunner was discharged from the Coumadin Clinic for not getting his INRs and for noncompliance. That was in May. He had a three-month subscription, which he fills religiously every month. On the 29th or 30th day, he gets 30 more 5-milligram pills and 31-milligram pills. He's out of medicine on September 22nd if he's taking his medicine daily with his prescription. He doesn't get arrested again until November 6th. So there's 45 days between him running out of his medicine and him being arrested. There's 68 days from the time he runs out of his medicine until he has the blood clot. So of course the court looked at the entire time period to determine whether he was coagulated or not. I understand the jury argument. That's mostly a jury argument. Maybe there's a legal argument in there. But the jury argument I totally get. That a jury should draw the inferences that you've suggested. The challenge that I've got is that there's some evidence that goes the other way. We know that he had leftover Coumadin. His family brings it to the jail. So we know there's Coumadin that's in his house. It's expired, but at least to my knowledge, there was an expert testimony to that expired Coumadin. Had he been taking it in the 45 days that you've prescribed, it would not have served its purpose. We know that he testified that he was getting prescriptions elsewhere from Dr. O, whoever that is. And the district court somehow excluded that as hearsay. I don't even understand that argument. But assume for a minute that I do not think that that's hearsay. And so it seems like to me based on, and there's a couple of others, but take just those two. Why couldn't a jury draw in all reasonable inferences in his favor conclude that, yeah, you have evidence of prescriptions to this date, but he had access to Coumadin, and he continued to take Coumadin for the 45 days that you think is critical? Well, a couple of points. First, I'll start with the opinions of Yoder and Labor. Because Yoder and Labor both say that it's the consistency of the dosage that's important. It's the amount of time that you're below the INR. You can answer a different question if you want to. But if you want to answer my question, go back to the one that I'm asking. So let me apologize, Your Honor. I'm happy for you to talk about something else if you want to. It's totally fine by me, right? I'm trying to get an answer to a question, but if you want to talk about something else, knock yourself out. The reason I point that out, Your Honor, is because the point is that he can't prove, he can't say that he was anti-coagulated if he's not taking it consistently. But Dr. O, hearsay. I do believe that evidence is hearsay and it's not admissible. But my question to you is, assume for a minute that it is admissible evidence, and the District Court got that wrong. I'm happy for you to debate that. I don't have questions about that. What I have a question about is, if you assume that I think that's admissible, and I think it's admissible that his family brought the same drug to the jail, which means that there was some availability of that item, of that drug in his house or with his family, if I take those two things as admissible, does that resolve the case? Does that, for summary judgment purposes? No, Your Honor, because he still, the reason the court looked at the entire time period is because the experts specifically testified that a few missed doses won't cause the blood clot. It's the length of time that you're sub-therapeutic, and he has no evidence that he's therapeutic during that time period. He has no INRs, and he has no evidence that he's taking it every day. So in your view, if he testified that, and I understand this is hypothetical, right? But if he testified, I've been taking this stuff for 20 years, and so I have a medicine cabinet full of it. And I have them separated by dosage. And so I took it every day, even though I didn't have a prescription. That wouldn't suffice because we don't have an INR that shows, like, documentary proof that he was, you know, appropriately medicated when he was admitted to the jail. I would correct, Your Honor. But I also would say, these are prescription medicines. You can't just have a cabinet full of Coumadin in your house. If you, they're prescribed by a physician. You probably have no leftover medicines in your medicine cabinet, right? Well, I might have. I won't answer that. It might get you in trouble, right? I wouldn't have enough. You'd be the only person in this courtroom if that were true, right? You'd be the only person, particularly if you had a drug that you had taken for 20 years, every single day, right? If you think that, like, that group of people, that we should draw the inference that somebody that's taken a drug for 20 years has none in his cabinet, even though his family brings it to the jail as soon as he's arrested. Like, that's an inference that seems, like, implausible to me, but in the wrong direction for you. Well, what's interesting about what the family brought to the jail was that they brought six pills. Two five milligram pills and four ones, which would not be enough for him to glass for more than a day or two. How long did he think, when he went in, wasn't there some testimony here that when he went in, the thought he was only going to be there for a day or maybe two? I understand it ended up being much longer, but the evidence suggested that he believed, and presumably what he believed his family could reasonably believe, that this was going to be a short stay. Well, the evidence would show that they brought the medicine on the second day, which would mean that he was going to be staying there longer, because his statement to Nurse Jackson on the first day was, I'm leaving this afternoon. He refused care, actually. He refused to even let her contact his physicians, because he says, I'm leaving. And so I don't, she doesn't make the calls until the next day. But if, in regards to what Dr., I mean, in regards to what Judge Osteen did, is he very methodically and in great detail went through all of the plaintiff's evidence as to show how he could have been anti-coagulated to such an extent that the few missed doses could have been the substantial cause of his blood clot. That's what he's got to show. That's what the plaintiffs have to show under the burden of proof for proximate cause. And the reality is, is they can't do that. Because his random statement about the mysterious Dr. O is not sufficient to establish that. Because he didn't have any INRs. He didn't have a prescription. The Maplewood facts that he's talked about in his argument is a total red herring. First, that document doesn't even show up until later, but it doesn't show that he has a prescription. They admitted in the record, in the oral argument hearing, that the Maplewood facts does not establish that he had a prescription at the time that that was done. Is that the real question, whether he had a prescription or whether he took the medicine? Your Honor, I see the point, but it is a prescription medicine. It's the length of time. But the point is whether he took medication, not whether he had a prescription. And not whether or not you know who you called the mysterious Mr. O. That's not the point either. He said, I had it and I took it. And I've been doing it for 20 years. I mean, certainly, he knows what it looks like. He knows what it feels like. I mean, the best evidence of any medical care is the body itself. People know when they haven't taken their hypertension medicine. You don't have to look. I remember because I'm a headache, I'm dizzy, I'm tired, I'm sleepy. I mean, you forget all the metabolical symptoms that arrive in human beings. So you say, oh, you didn't have a prescription. He said he took it. And there's evidence that his family helped in those kind of things. We're talking about summary judgment here.  And all reasonable inferences to be drawn the non-moving party, right? True, Your Honor. But I would also say this court has been very consistent in a long line of medical malpractice cases of saying that the experts have to establish admissible evidence and it cannot be temporal in time. When you look at the deposition testimony of labor in Yoda both of them say a few missed doses in the jail will not cause a blood clot. It has to be a substantial amount of time that they're sub-therapeutic. And so he's got to show that. And I would also point out by... But doesn't that also mean that like a few missed doses before he goes in the jail wouldn't cause the problem? Right? I mean, I get these are all arguments you're going to get to make before a jury. But if a few missed doses in the jail wouldn't cause a problem, then a few missed doses in the 45 days wouldn't cause a problem, right? That evidence goes both ways. You can choose to rely on it or not, but you don't get to say he had to take seven and a half milligrams every single day for those 45 days, and then turn around and say, but a couple of missed doses in jail wouldn't matter, right? You got to pick one of those, right? Or, more accurately, a jury's got to pick one of those. Well, Your Honor, he has to establish that he has taken the medicine enough both before and after. And also, I would agree, a few missed doses right before, but that's not what we're dealing with here. Doesn't the doctors also in their deposition discuss underdosing? Well, underdosing actually was Dr. Labor's declaration where he offered that new opinion after the summary judgment had already been briefed and decided, where he said that the prescription that Dr. Maldonado gave at the jail was too low. But I would point out, first, the ruling out of the Labor declaration is under abusive discretion. Secondly, both Mooney and Yoder testified that the five milligram prescription by Dr. P.A. Maldonado was the appropriate way to start when you come in with somebody that's new and they don't know. So that was never contended to be actually what's interesting about the case is there are only three claims against Maldonado and Jackson for a breach of the standard of care, none of which, I would say, meet the connection between to cause the blood clot. Jackson was that she didn't advocate for him enough to get him medicine on November the 8th. Well, the day before, he didn't allow her access, but it was just one day there. And secondly, she got ordered the medicine that day. There's no evidence that anybody even used the transformed form for treatment. And Maldonado's claim by Mooney was that he didn't bridge him earlier in the incarceration. So none of those would necessarily connect to a blood clot that occurred three weeks later. And they have to show under their burden that the negligence itself has to be substantially connected to the injury to establish the proximate cause. And that's why, getting back to my original point about, I would also want to point out about the temporal connection. I think it falls under the, I would also ask the court to consider the Riggins versus Yanceyville case, which is one of the cases decided 2020 decision by this court goes through a very good detailed analysis of proximate cause and how the courts looked at that in Fitzgerald, Born, and Blake. And how, what's necessary to establish proximate cause in the fourth circuit. And I would also suggest that this case is similar to the Born case where you have, that was the case where it was a question of the, whether she'd been exposed to it or not. Are there any further questions? I see that my time's up. I meant to say at the beginning, Mr. Gunner, I mean Mr. Wood will be arguing the issues related to the public defendants. Yes. Thank you, Mr. Long. Good morning, Judge Gregory, Judge Benjamin, Judge Richardson. My name is Bradley Wood. I'm from the Forsyth County, North Carolina Bar, and I represent the public defendants in this case. They are Davie County, North Carolina, Stokes County, North Carolina. The former sheriff of Davie County who was named Andy Stokes and the former sheriff of Stokes County whose name is Mike Marks   and then the jail administrators for each of those counties. And I'll just start out by saying that the lower court was correct in finding that there was no constitutional violation as to Mr. Gunter and that my clients did not violate any constitutional standard and should not be held liable in any event. What the plaintiff is attempting to do is to hold my clients vicariously liable for the medical malpractice or for the medical decisions of the Southern Health Partner defendants. And they're not able to do that. There's no evidence that any of the sheriff or the jail administrator or anyone for that nature had any knowledge or personal involvement in the plaintiff's care. And there's no evidence that any policy that they had, the plaintiff has argued some policy in his reply brief. But I should point out to the court that at no point in time has the plaintiff actually brought forth the medical plans and the policies of either of the sheriffs in his briefings either with this court or at the lower court. And he's got an obligation to do that. The policies and medical plans for the jails were provided to the plaintiff in discovery and he chose not to argue those. And so he's attempting to, I guess, put upon my clients once again by vicarious liability the supposed liability of the medical defendants. And so he can't proceed with that. And I think the court properly ruled below that there was no constitutional violation and that, likewise, there's no Monell claim that he can advance under any of the theories under Monell. And I'm willing to certainly entertain any questions that any of your honors may have. So you're saying that there are no issues about the continuity of the care of the, while he was there, his medical care in terms of making sure the medicine, so it's no? That's it. Those are the medical decisions of the medical defendants and my clients. The case law is clear that, I guess, jail administrators, correctional officers, what have you, are entitled to rely upon the decisions of the medical care providers. And there's no evidence, in fact, the lower court made clear, there's no evidence that any of my clients had any knowledge or aware of any sort of improper or inadequate medical care. And the plaintiff's, in the past, by Southern Health Partners at either facility and the plaintiff has not come forward with any evidence to substantiate that. So, again, what Your Honor is asking is attempting to hold my clients vicariously liable for the, however, Fran Jackson filled out the paperwork to send it to Stokes County and what Judge, excuse me, what Nurse Hunt made decisions to do. Your theory is that even if we disagree with your colleague and think that at least some of the medical defendants have to go back, your point is that they haven't put forward a dispute about the government entities that they improperly hired this group or improperly supervised this group or directed this group to do things that they shouldn't have. That's entirely correct, Your Honor. And to your previous point, it's interesting that the short case also arose from the Davie County Detention Center, but that change in the law does not affect my clients because none of them were personally, there's no evidence, there's no allegation, any of them knew anything about the, Mr. Gunter. And so the changing from a subjective standard to an objective standard still requires at least for the second and third prongs of the new short test and those simply can't be met. But Your Honor, Judge Richardson, that's our position that even if for some reason the case should go back to the jury with regard to the medical issues, none of that affects my clients.  there's no, from their perspective, no constitutional violation and no viable Monell claim under any theory. Thank you for your time. Thank you, Mr. Wood. Mr. McDonald, you have some time reserved. Thank you very much. I'd like to begin with the public defendants if I might. These were not decisions, our complaint is not about the decisions that the medical care providers in terms of the provision of medical care. It was the inadequate policies. We argued those policies in the brief. We set out what the policies are. They're supported by the evidence and we have asked the court to consider that as part of our 1983 case against the public defendants. What's your response to your colleagues position that in the Monell situation that there's nothing that connects them personally or knowledge and boots on the ground or direction or anything like that, notwithstanding the policies? Monell itself did not involve a personal knowledge of the women that were excluded. It was a policy that excluded them all. It wasn't that specific instance here. These were not medical decisions. You have to be able to show the unconstitutional patterns and practices and customs here. That's right. These customs clearly had an influence here. These customs were that they don't do discharge summaries. They don't have physicians available. They have a nurse on part-time. They have a physician assistant that visits the jail every other week. Mr. Gunner, with this serious condition, and it was clear a very serious condition, never saw a doctor. What about this argument that you didn't that is weighed because you didn't appeal to individual defendant claims?  we think that the Monel claim is based on the policies of the state. Yeah, but you  you have to be able to say that constitutionally that an individual constitutionally violated his rights. When it's a policy, I don't know that you have to be able to get to the Monel claim. That's Estelle. Estelle provides that when an inmate is in  that the custodian is obligated to provide the medical services that are required to maintain health. That's a constitutional violation and they didn't provide that here. And it wasn't a question of medical opinion. Nurse Hunt didn't have any information and she didn't have any information even though she reported to Dr. Maldonado and Maldonado had followed him because he was the same physician's assistant. So there was no continuity of care and continuity of care is one of the issues that the state and the counties did not provide for. Now, they do it for their prisoners. I'd also like to address, if I may, the question about speculation. There wasn't speculation. The two expert witnesses who testified that Mr. Gunner was taking his medication based that on, I mean, they certainly were not present during those days. They didn't watch him take his pills, but Dr. Yoder knew his habits and we can supply according to the rules that an expert may opine about facts that can be supported by other evidence and here we supported those other evidence and it was not speculation that he had access to the medication and took it. Also, with Dr. Labor, underdosing was not a new opinion. In his deposition, he stated that he did not get the right dosage. When he came later to say that underdosing was an issue, it was not a new opinion of the expert witness. One other question regarding, he brought up the temporal proximity and the time period between when he was released and when he was admitted to the medical center. I think it was at least on the 21st and admitted to the medical center. I think when he was admitted to the medical center, he said he had not been taking the medication a few days before. I'm curious to hear your argument regarding the  issue there. Between the time he was released and the time he was admitted to the medical center. May I complete my answer? Yes, you may. The temporal proximity, that's the Lipitor case. The court determined that if the only basis for an opinion is temporal proximity, then that's not sufficient because there are too many other possible causes. Both Dr. Labor and Dr. Yoder testified about many other circumstances, including things like the fact that he had a mechanical heart valve, the fact that he was taking Coumadin, the fact that he had an INR in the middle of this confinement that showed that he was completely unanticoagulated, if that's the word. He didn't rely, and neither did Dr. Yoder, solely on the temporal proximity. It was a factor, but it's not an impermissible factor. It just has to be more than just temporal proximity. Dr. Labor said that the  blood  took up to five days before he was admitted to the hospital, which was only a couple of days after he was released. He also said that blood clots take time to  There's no way to pinpoint a moment when a blood clot forms, but the longer that a person is not properly anticoagulated, the more it's exponential, the risk. And here, six days into his confinement, they did take an INR, and he was completely unanticoagulated, again, if that's still a  And they knew that it wasn't, and the risk to him of forming blood clots was exponentially greater. Anything else? I've got two, 23. I don't know if that's more time or not. Well, do you have anything further? Because I think it's going up. See, when it increases, that means your time is over. I think I've addressed the concerns unless I have not done so. Thank you.  Mr. McDonald. Thank you very  We'll come down, greet counsel, and proceed to our next case.
judges: Roger L. Gregory, Julius N. Richardson, DeAndrea Gist Benjamin